# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| JOSEPH RESCH, *et al.*, | : |
| Plaintiffs, | : CIVIL ACTION |
|  | : NO. 11-6893 |
| v. | : |
| KRAPF'S COACHES, INC., | : |
| Defendant. | : |

**Memorandum**

YOHN, J.                                                                                                           August 29, 2013

This is an action brought by plaintiffs against their employer, defendant Krapf's Coaches Inc., ("KCI"), for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and the Pennsylvania Minimum Wage Act of 1968 ("PMWA"), 43 Pa. Stat. Ann. §§ 260.1 *et seq.,* for failure to compensate them at one and one-half times the regular rate of pay for hours worked in excess of forty hours per week. (Compl. ¶¶ 9, 15-19.) KCI admits that it does not pay its transit drivers premium overtime rates, and instead moves for summary judgment on plaintiffs' FLSA claim arguing that plaintiffs are exempt from FLSA's overtime requirements based on the "motor carrier exemption." (Def.'s Statement of Material Facts, as to Which No Genuine Issues Exist, in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Facts") ¶ 4.) *See* 29 U.S.C. § 213(b)(1).[1] After careful consideration of the parties' arguments and the evidence presented, I

---

[1] In its motion for summary judgment and brief in support of the motion, defendant only discusses plaintiffs' FLSA claim, and does not touch on plaintiffs' PMWA claim. At oral argument defendant stated that it wanted to amend its brief to include an argument for summary

1

will grant KCI's motion for summary judgment for plaintiffs' FLSA claims.

I.      Background[2]

On November 3, 2011, plaintiff Joseph Resch brought this action under FLSA and the PMWA, on behalf of himself and other employees and former employees of defendant, KCI. On June 28, 2012, I granted conditional certification to "all individuals who were employed by defendant as Transit Route drivers who worked over 40 hours during any workweek within the past three years." *See* Order, June 28, 2012, ECF No. 16. Notice was sent to 129 potential class members,[3] and 34[4] current or former employees opted into the action. (Pls.' Resp. to Def.'s Statement of Facts ("Pls.' Resp. to Def.'s Facts") ¶ 11.)

KCI is a bus company that operates a transit division and a charter division. KCI's transit division operates shuttle services for private companies, local colleges, and the Southeastern Pennsylvania Transportation Authority ("SEPTA"). (Compl. ¶ 10; Def.'s Facts ¶ 3; Pls.' Resp. to Def.'s Facts ¶ 3.) The majority of KCI's transit routes are intrastate; however, some routes cross

---

judgment on plaintiffs' PMWA claim. (Oral Argument at 10:59 (E.D. Pa. Mar. 8, 2013), ECF No. 56.) As defendant did not raise this argument it its original briefing, I will reserve decision with respect to plaintiffs' PMWA claim, pending defendant's filing a motion clarifying the effect of this decision on that claim, and any other grounds offered as grounds for judgment with respect to the PMWA claim. *Friedrich v. U.S. Computer Servs.*, 787 F. Supp. 449, 458 (E.D. Pa. 1991) *aff'd*, 974 F.2d 409 (3d Cir. 1992) (dismissing plaintiffs' FLSA claims but refusing to decide plaintiffs' Pennsylvania state law claims pending defendant's filing a motion on the matter.)

[2] The facts are undisputed unless otherwise noted.

[3] Defendant alleges that notification was sent to 142 potential class members. (Def.'s Facts ¶ 11.)

[4] There was some confusion about the number of plaintiffs in this action; however, at oral argument both parties agreed that there were 34 plaintiffs in this action. (Oral Argument at 10:58 (E.D. Pa. Mar. 8, 2013), ECF No. 56.)

state lines. During the relevant time period, KCI has operated two routes that transport passengers interstate: KCI SEPTA 306, a route that transported passengers from Pennsylvania to Delaware until November 2010; and the Arkema Woodcrest Route, a shuttle that transports Arkema, Inc. employees from various locations including the PATCO station in Cherry Hill, New Jersey, to the Arkema facilities in King of Prussia, Pennsylvania. (Def.'s Facts ¶¶ 19, 22; Pls.' Resp. to Def.'s Facts ¶¶ 19, 22.) Additionally, KCI operates two routes where the drivers cross state lines with the buses in order to transport passengers intrastate: the KCI Capital One line in Wilmington, Delaware, which began service on December 3, 2012; and the Ready Pac route in Swedesboro, New Jersey, which began service in August 2012. (Def.'s Facts ¶¶ 28, 31; Pls.' Resp. to Def.'s Facts ¶¶ 28, 31.) Transit drivers also on occasion drive charter trips, and some charter trips are interstate. (Def.'s Facts ¶¶ 53-54; Pls.' Resp. to Def.'s Facts ¶ 54.)[5]

Finally, defendant operates what it calls "continuum trips"–KCI routes that transported passengers to other transportation lines where KCI believes the passengers continued their travels interstate. (Def.'s Facts ¶ 37.) Specifically, defendant asserts that Route A, Coatesville Link, SCCOOT, Beeline, Parkway, Parktown, Wyeth, Pfizer, SEPTA 205, SEPTA 204, Rambler,

---

[5] Defendant claims that a significant amount of charter trips are interstate but plaintiffs deny this fact. (Def.'s Facts ¶ 53; Pls.' Resp. to Def.'s Facts ¶ 53.) For summary judgment purposes I must, obviously, accept plaintiffs' version. Additionally, defendant states that transit drivers cross state lines to go into New Jersey to run errands for KCI but, plaintiffs deny this assertion. (Def.'s Facts ¶ 64; Pls.' Resp. to Def.'s Facts ¶ 64.) Gary Dallas Krapf, President of KCI, however, gave deposition testimony that supports defendant's claim that some transit drivers crossed state lines for errands, and plaintiffs fail to point to any evidence that refutes that assertion. (Def.'s Facts ¶ 64; Pls.' Resp. to Def.'s Facts ¶ 64.) Finally, plaintiffs state that driving charter trips is voluntary and points to deposition testimony to support this assertion, while defendant states that charter trips are assigned. (Def.'s Facts ¶ 50; Pls.' Resp. to Def.'s Facts ¶ 50.); (Dep. of Barry Sealy (Feb. 20, 2013) ("Sealy Dep.") 50:20-51:7.) For summary judgment purposes I must accept plaintiffs' version.

Conshohocken Rambler, Villanova Shuttle, Arkema routes, the Wyndham route, and the Navy Yard route are all continuum routes because they connected with other transit lines such as Amtrak, Greyhound, SEPTA, and the airport. (Def.'s Facts ¶ 35.)[6]

In 2009 and 2010 the only route that crossed state lines was the SEPTA 306 route, which went through Delaware until November 2010. (Def.'s Br. in Supp. of Mot. Summ. J. ("Def.'s

---

[6] Plaintiffs refute defendant's assertion that the continuum routes constitute interstate commerce. (Pls.' Resp. to Def.'s Facts ¶ 37.) I agree with plaintiffs that defendant's continuum routes do not qualify as interstate travel under Third Circuit precedent. *Packard v. Pittsburgh Transportation Co.*, 418 F.3d 246 (3d Cir. 2005). In *Packard*, the Third Circuit examined whether the motor carrier exemption applied to "ACCESS drivers" who transported passengers entirely intrastate but whose stops often included transportation hubs such as the Pittsburgh International Airport and the Pittsburgh Amtrak and Greyhound Stations. (*Id.* at 249.) The Third Circuit concluded that the ACCESS service did not count as interstate transit because there was no "practical continuity of movement." The Third Circuit noted:
> ACCESS service to interstate terminals similarly involves no joint fare or ticketing arrangement, and no prior arrangement of any kind, contractual or otherwise, with the railroads, airlines, or other companies that carry a certain few ACCESS passengers across state lines. Also, there is no strong, established cycle of regular passenger movement between the ACCESS service and particular interstate routes. To the ACCESS drivers and their passengers, a trip to an interstate travel hub is just another local fare . . . . [T]he ACCESS drivers' services are not arranged as part of their passengers' interstate travels through a pre-packaged tour, or linked in any other way. Even where certain of ACCESS passengers' travels will eventually carry them out of the state, the ACCESS service itself is purely intrastate.

*Packard*, 418 F.3d at 258. Accordingly, the Third Circuit held that because "there is no evidence of *any arrangement* between [the defendant] and the other carriers . . . the [motor carrier] exemption [is] inapplicable to the ACCESS drivers." *Id.*

It is clear that, under *Packard*, defendant's continuum routes do not qualify as interstate transit. Like the ACCESS service in *Packard*, for these continuum routes there is no prior arrangement of any kind with any of the transit hubs where defendant deposits its passengers. Additionally, the continuum route service for these lines is not arranged as a prepackaged part of any passengers' interstate travel. Thus, "[e]ven where certain of [continuum routes'] passengers' travels will eventually carry them out of the state, the [continuum routes] service itself is purely intrastate." (*Id.* at 258.) Accordingly, the only transit routes that will be considered interstate are the four routes that actually crossed state lines: SEPTA 306, Arkema Woodcrest Route, KCI Capital One, and Ready Pac.

Br.") at MSJ-1.); (Def.'s Facts ¶ 66; Pls.' Resp. to Def.'s Facts ¶ 66.) The SEPTA 306 route earned $397,673 in revenue in 2009, which was 8.4% of the transit revenue for that year. (Def.'s Facts ¶ 66; Pls.' Resp. to Def.'s Facts ¶ 66.) In 2010, the SEPTA 306 route earned $485,170 in revenue, which was 9.7% of the transit division's revenue. (Def.'s Facts ¶67; Pls.' Resp. to Def.'s Facts ¶ 67.) In 2011, the only transit route that drove interstate was the Arkema Woodcrest service and that generated $50,526 in revenue, or 1% of the transit division's revenue. (Def.'s Facts ¶ 68; Pls.' Resp. to Def.'s Facts ¶ 68.) In 2012, the Arkema Woodcrest line generated $101,052 in revenue, or 2.5% of the transit divisions revenue. (Def.'s Facts ¶ 69; Pls.' Resp. to Def.'s Facts ¶ 69.) In 2012 the Ready Pac line generated $112,188, or 2.8% of the transit division's revenue. (Def.'s Facts ¶ 69; Pls.' Resp. to Def.'s Facts ¶ 69.) Accordingly, in 2012, the Arkema Woodcrest line and the Ready Pac line accounted for 5.3% of the transit division's revenue. KCI believes that based on the revenue generated from the Capitol One, Ready Pac, and Arkema Woodcrest routes, routes that travel interstate in 2013 will exceed any year from 2009 through 2012. (Def.'s Facts ¶ 71; Pls.' Resp. to Def.'s Facts ¶ 71.)

On September 28, 1983, the Interstate Commerce Commission (predecessor of the Department of Transportation) issued KCI a Certificate of Public Convenience and Necessity, No. MC-164984, Sub. 1 and 2, which gives KCI the authority to operate in interstate commerce as a motor carrier. (Def.'s Facts ¶ 8; Pls.' Resp. to Def.'s Facts ¶ 8.) The certificate remains in effect. (Dep. of Kevin Pierce (Feb. 25, 2013) ("Pierce Dep.") 34:1-5.) Since October 6, 1998, KCI's Transit and Charter divisions have operated under United States Department of Transportation ("DOT") registration number 774388. (Def.'s Facts ¶ 6; Pls.' Resp. to Def.'s Facts ¶ 6.)

5

Because KCI is an interstate carrier, it is governed by the Federal Motor Carrier Safety Administration ("FMCSA")[7] regulations. In its employee handbook, KCI details all the federal regulations by which drivers must abide, including: "holding a Commercial Driver License ('CDL'); passing a pre-employment physical, drug test, and bi-annual physical; and satisfying, among other things, a prior Safety Performance History Record in accordance with Federal Motor Carrier Safety Regulations ('FMCSR')." (Def.'s Facts ¶ 72; Pls.' Resp. to Def.'s Facts ¶ 72.) KCI drivers receive a copy of the handbook upon beginning employment with KCI. (Def.'s Facts ¶ 73; Pls.' Resp. to Def.'s Facts ¶ 73.) Additionally, KCI maintains a Driver Qualification File, as detailed by FMCSA. (Def.'s Facts ¶¶ 76-78; Pls.' Resp. to Def.'s Facts ¶¶ 76-78.) *See* 49 C.F.R. pt. 391.01. Finally, since April 2012, all drivers have been required to complete a "Self Certification Form" promulgated by Pennsylvania's Department of Transportation, and they are all required to check the box that says "NI-Non-Excepted Interstate Transportation: Interstate Drivers Who are Subject to the Federal Physical Qualifications and Examination Regulations." (Def.'s Facts ¶¶ 83-84; Pls.' Resp. to Def.'s Facts ¶¶ 83-84.)

FMCSA audits KCI's compliance with FMCSA regulations approximately every two years. FMCSA last audited KCI in August 2012 and reviewed, among other things, driver qualification files for transit and charter drivers, driver logs, KCI's drug testing records, and other documents. (Aff. of Gary Krapf (Apr. 22, 2013) ("Krapf Aff.") ¶ 6; Pls.' Resp. to Def.'s Facts ¶ 87-89.) The FMCSA has specifically cited KCI for transit drivers' violations. (Def.'s Facts ¶ 89; Pls.' Resp. to Def.'s Facts ¶ 89.)

---

[7] The FMCSA is a separate administration within the Department of Transportation. 49 U.S.C. § 113.

Generally, transit drivers are assigned their weekly route assignments on the Wednesday of the preceding week by a scheduler. (Def.'s Facts ¶ 41; Pls.' Resp. to Def.'s Facts ¶ 41.) Once a transit driver has trained on a particular route, he or she may be assigned to that route at any time, as KCI's need presents. (Def.'s Facts ¶ 42; Pls.' Resp. to Def.'s Facts ¶ 42.) Cythia Metivier, a scheduler at KCI, testified that KCI generally tries to train drivers on most routes so the company can utilize the drivers on the routes;[8] however, plaintiffs claims that some transit drivers only drive a few of the routes. (Def.'s Facts ¶ 43; Pls.' Resp. to Def.'s Facts ¶¶ 45, 47.)

In this case, sixteen of the thirty-four opt-in plaintiffs never traveled outside of Pennsylvania.[9] (Pls.' Resp. to Def.'s Facts ¶ 49.) Of the eighteen plaintiffs who did travel interstate, eight traveled interstate once, and five traveled interstate on five or fewer occasions.[10] (Pls.' Resp. to Def.'s Facts ¶ 49); (Def.'s Br. at MSJ-4.).

## II. Standard of Review

A motion for summary judgment will be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that could affect the outcome of the

---

[8] Plaintiffs admit that this was Metivier's response; they deny, however, that transit drivers are trained to drive on most of defendant's routes and point to various employees' deposition testimony that states the limited number of routes plaintiffs drove. (Pls.' Resp. to Def.'s Facts ¶¶ 45, 47.) Thus, because plaintiffs are the non moving party, I accept their assertion that some plaintiffs drove a limited number of routes.

[9] These plaintiffs are Charles Boggs, Kevin Dennis, Michael Hall, John Holland, Harry Johnson, Dolly Lee, Cynthia Lipscomb, Deatrice Loftin, Douglas Mathis, Kenneth McClain, Elizabeth McNair, Richard Mendez, Howard Murrey, Adalberto Rodriguez, David Simmons, and Edward Wallin.

[10] The parties do not distinguish between the interstate transit trips and the interstate charter trips. (Def.'s Br. at MSJ-4.)

proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Roth v. Norfalco LLC*, 651 F.3d 367, 373 (3d Cir. 2011) (internal quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

The moving party bears the initial burden of showing that there is no genuine issue of material fact and that it is entitled to relief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the nonmoving party must present "specific facts showing that there is a *genuine issue for trial*," *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted), offering concrete evidence supporting each essential element of its claim, *see Celotex*, 477 U.S. at 322–23. The nonmoving party must show more than "[t]he mere existence of a scintilla of evidence" for elements on which it bears the burden of production, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and may not "rely merely upon bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

When a court evaluates a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996). (internal quotation marks and citations omitted). "[A]n inference based upon a speculation or

conjecture," however, "does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

**II.** **Discussion**

    A.    **FLSA's Motor Carrier Exemption**

This case turns on the narrow issue of whether Section 13(b)(1) of FLSA (commonly known as the "motor carrier exemption") exempts plaintiffs from the maximum hour and overtime provisions of the Act. *See* 29 U.S.C. § 213(b)(1). Specifically, the motor carrier exemption states that FLSA's hour and overtime provisions are not applicable to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." *Id. See also Packard*, 418 F.3d at 250. Section 31502 provides the Secretary of Transportation with the power to regulate employees who work for motor carriers and motor private carriers "when needed to promote safety of operation." 49 U.S.C. § 31502(b)(2).

The Department of Labor interprets the motor carrier exemption to apply to employees whose work "directly affect[s] the safety of operation of motor vehicles on the public highways in transportation in interstate or foreign commerce within the meaning of the motor carrier act." 29 C.F.R.§ 782.2(b)(2). Thus, in order for the motor carrier exemption to apply the class of employees must: "1) be employed by carriers whose transportation of passengers or property by motor vehicle is subject to [the Secretary of Transportation's] jurisdiction under section 204 of the Motor Carrier Act; and 2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." *Id.* §

9

782.2(a). The Supreme Court in *Morris v. McComb* explained that:

> The first question is whether the Interstate Commerce Commission has the power, under s 204 of the Motor Carrier Act, 1935, to establish qualifications and maximum hours of service with respect to drivers and mechanics employed full time . . . . The other question is whether, if the Commission has that power, the overtime requirements of s 7 of the Fair Labor Standards Act of 1938 apply to such employees in view of the exemption stated in s 13(b)(1) of that Act. We hold that the Commission has the power in question and that the overtime requirements of s 7 of the Fair Labor Standards Act therefore do not apply to such employees.

*Morris v. McComb,* 332 U.S. 422, 423-24 (1947). The exemption does not apply if the "continuing [interstate] duties of the employee's job . . . are so trivial, casual, and insignificant as to be *de minimus*." 29 C.F.R.§ 782.2(b)(3).

"It is well settled that exemptions from FLSA are construed narrowly, against the employer." *Packard* , 418 F.3d at 250. Additionally, "[i]t is the employer's burden to affirmatively prove that its employees come within the scope of the overtime exemption, and entitlement to the exemption must be proven 'plainly and unmistakably.'"*Badgett v. Rent-Way, Inc.*, 350 F. Supp. 2d 645-46 (W.D. Pa. 2004) (citing *Friedrich v. U.S. Computer Servs.*, 974 F.2d 412 (3d Cir. 1992)). Because this is a motion for summary judgment defendant has the burden to prove that the employees qualify for the motor carrier exemption based on undisputed facts, or if plaintiffs dispute material facts, then based on plaintiffs' version of those facts.

Plaintiffs concede that KCI is a motor carrier as defined by the Motor Carrier Act, and thus subject to the DOT's jurisdiction. (Pls.' Br. in Opp'n to Mot. for Summ. J. ("Pls.' Br.") at 11.)[11] Defendant notes that it is regulated by DOT and holds itself out to be an interstate carrier.

---

[11] Plaintiffs also agreed that KCI was an interstate motor carrier and subject to DOT's jurisdiction during oral argument. (Oral Argument at 11:10 (E.D. Pa. Mar. 8, 2013), ECF No. 56.)

(Def.'s Br. at 7-9.)[12] Accordingly, I agree that defendant has satisfied its burden of establishing that it is an interstate motor carrier. Additionally, plaintiffs admit that as drivers their activities directly affect the "safety of operation of motor vehicles." (Pls.' Br. at 9.) Thus, the only disputed issue is whether plaintiffs' activities were sufficiently related to interstate commerce to qualify for the motor carrier exemption.

B. **The Reasonable Expectation of Interstate Driving**

Plaintiffs contend that defendant must demonstrate that each of the plaintiffs individually fulfills the motor carrier exemption's interstate travel requirement by examining their individual travel activities and showing that they transported passengers in interstate commerce. (Pls.' Br at 8-9.) The majority of the plaintiffs' argument focuses on the fact that sixteen of the plaintiffs never traveled across state lines and the remaining eighteen plaintiffs' interstate travel was *de minimus*. (*Id.* at 12-14.)

Defendant, however, argues that it is not required to show that each plaintiff traveled interstate, and instead, defendant argues it merely needs to prove that plaintiffs *could have reasonably been expected to cross state lines* as part of their employment. (Def.'s Br. at 11-12.) I agree with the defendant's summary of its burden. In *Morris v. McComb,* the Supreme Court stated that "it is the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the [Secretary's] power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment." 332 U.S. at 431. The Court explained that the interstate commerce

---

[12] In *Morris*, the Supreme Court held that the employees were exempt under the motor carrier exemption even though only 4% of the employer's business was interstate. 332 U.S. at 432-33. Defendant notes that for all years except 2011, KCI's interstate business exceeded 4%.

11

trips were "distributed generally throughout the year and their performance was shared indiscriminately by the drivers and was mingled with the performance of other like driving services rendered by them otherwise than in interstate commerce." *Id.* at 433. Thus, the Supreme Court held that "[t]hese trips were thus a natural, integral and apparently inseparable part of the common carrier service of the petitioner and of his drivers," and the Interstate Commerce Commission ("ICC") (now DOT) had jurisdiction to regulate all of the defendant's drivers even though two drivers had never driven interstate.[13] *Id.*

Additionally, since the *Morris* decision, the Department of Labor and DOT have issued regulations and notices of interpretations, respectively, that are consistent with the holding in *Morris*. Specifically, the FLSA regulations state that generally, if the employee's job duties are such that "he is . . . (or . . . is likely to be) called upon in the ordinary course of his work to perform, either regularly or from time to time," interstate driving he comes within the motor carrier exemption. 29 C.F.R. § 782.2(b)(3). The DOT has stated that "a driver will remain under

---

[13] In their brief plaintiffs state that, "the *Morris* opinion has no bearing on the Court's analysis of Plaintiff's interstate travel because *Morris* only covered whether the amount of interstate travel by drivers qualified the employer, not the employees for the MCA exemption." (Pl.'s Br. at 11.) However, plaintiffs seemingly misinterpret *Morris*, because it did hold that the plaintiffs were under the ICC's jurisdiction, and accordingly could not also be under the Secretary of Labor's jurisdiction. *See Morris*, 332 U.S. at 434-340. Specifically, the court stated "Having determined that the Commission has the power to establish qualifications and maximum hours of service for these drivers and mechanics' under s 204 of the Motor Carrier Act, the question recurs as to whether . . . the requirements of s 7 of [FLSA] nevertheless apply to these employees. This issue as to the possible reconciliation of the language of these Acts so as to provide for concurrent jurisdiction was considered at length in the Levinson case and the conclusion was there reached that such a construction was not permissible." *Id.* at 437-38. Additionally, numerous other courts have interpreted *Morris* as concerning the plaintiffs entitlement to FLSA overtime payments. *See Songer v. Dillon Res., Inc.*, 618 F.3d 467, 471 (5th Cir. 2010); *Finney v. Free Enter. Sys., Inc.*, 2012 WL 5462971, at *4 (W.D. Ky. Nov. 8, 2012); *Badgett*, 350 F. Supp. 2d at 655.

the [Secretary's] jurisdiction . . . for as long as the driver is in a position to be called upon to drive in interstate commerce as part of the driver's regular duties." Application of the Federal Motor Carrier Safety Regulations, 46 Fed. Reg. 37,902; 37,903 (July 23, 1981) ("DOT Notice"). Accordingly, defendant does not need to prove that each plaintiff drove interstate regularly, or even that they have driven interstate at all; instead, defendant must simply prove that "because of company policy and activity, the driver could *reasonably* be expected to do interstate driving." *Friedrich*, 974 F.2d at 412 (quoting DOT Notice at 37,903.)

      C.      **Whether Plaintiffs Could Reasonably be Expected to Drive Interstate**

Defendant argues that transit drivers, including plaintiffs, are assigned transit routes based on the business needs of KCI, and, accordingly, could have reasonably been expected to drive interstate on any of KCI's four interstate transit routes. The most important factor courts have used to determine whether a driver may reasonably be called upon to drive interstate is the assignment procedure the employer uses. In *Morris*, the Supreme Court focused on the indiscriminate nature of the route– the fact that anyone could get assigned an interstate route– to determine that the employees were all exempt. 332 U.S. at 433. The Court detailed that "[I]n the normal operation of the business, these strictly interstate commerce trips were distributed generally throughout the year and their performance was shared indiscriminately by the drivers and was mingled with the performance of other like driving services rendered by them otherwise than in interstate commerce. These trips were thus a natural, integral and apparently inseparable part of the common carrier service of . . . [the] drivers."

In this case, it is undisputed that drivers are assigned transit routes every week by a

dispatcher and are required to drive the routes that have been assigned.[14] (Def.'s Facts ¶ 45; Pls.' Resp. to Def.'s Facts ¶ 45.) During oral argument plaintiffs admitted that any transit driver, including all plaintiffs, could be assigned an interstate transit route and they could be disciplined for turning down a transit route. (Oral Argument at 11:48-49 (E.D. Pa. Mar. 8, 2013), ECF No. 56.)[15] *See Songer*, 618 F.3d at 475 (fact that drivers were assigned routes by dispatcher indiscriminately based on certain factors was evidence that any driver could be assigned an interstate route); *Vidinliev v. Carey Int'l*, Inc., 581 F. Supp. 2d 1281, 1286-87 (N.D. Ga. 2008) (defendant's indiscriminate assignment of routes to drivers evidence that drivers were exempt from FLSA). Accordingly, the indiscriminate nature KCI's assignment procedure is undisputed evidence that plaintiffs could be reasonably expected to drive interstate.

Additionally, defendant takes great effort to ensure that transit drivers comply with the federal requirements for interstate driving so that every transit driver can drive interstate at anytime. KCI maintains a driver qualification file for each transit driver, as detailed by FMCSA, to prove that drivers meet the minimum qualifications for drivers of commercial motor vehicles. (Def.'s Facts ¶¶ 74, 76-78; Pls.' Resp. to Def.'s Facts ¶¶ 74, 76-78.) *See* 49 C.F.R. pt 391.01. Specifically, some of the DOT and FMCSA requirements that defendant requires transit drivers to follow are: getting a commercial drivers license, complying with all drug testing requirements,

---

[14]There is evidence that drivers can ask for a schedule change on occasion because of the driver's personal circumstances that week; however, not all requests are granted. (Def.'s Facts ¶¶ 44-45; Pls.' Resp. to Def.'s Facts ¶¶ 44-45.) Additionally, plaintiffs admitted during oral argument that they would be subject to discipline for refusing to drive a route.

[15] This assignment process only applies to the assignment of transit routes. Plaintiffs dispute and have presented evidence that charters, including interstate charters, are assigned on a voluntary basis. (Sealy Dep. 50:20-51:23; Dep. of Bradley Lynn Hopkins (Feb. 20, 2013) ("Hopkins Dep.") 39:17-40:10.) The charter division is not involved in this action.

taking bi-annual DOT physicals, and getting prior safety performance history records, among other requirements. (Def.'s Facts ¶ 72; Pls.' Resp. to Def.'s Facts ¶ 72.) Additionally, upon beginning employment, defendant notifies transit drivers of these federal requirements by listing them in KCI's employee handbook, and by issuing all drivers a "Federal Motor Carrier Safety Regulations Handbook." (Def.'s Facts ¶¶ 72, 86; Pls.' Resp. to Def.'s Facts ¶¶ 72, 86.) *See Chao v. First Class Coach Co., Inc.*, 214 F. Supp. 2d 1263, 1275 (M.D. Fla.2001) (explaining that evidence of complying with federal requirements including keeping "driver qualification files" was evidence that employee drivers reasonably could have been expected to drive interstate); *Songer v. Dillon Resources, Inc.*, 636 F. Supp. 2d 516, 526 (N.D. Tex. 2009) (holding same). Finally, it is undisputed that DOT has audited defendant and has specifically cited KCI for violations of transit drivers.[16] (Def.'s Facts ¶ 89; Pls.' Resp. to Def.'s Facts ¶ 89.)

Finally, while some plaintiffs have never traveled interstate or have traveled interstate infrequently, the undisputed facts show that KCI's transit division was significantly engaged in interstate commerce, and, accordingly, at all times plaintiffs could have been assigned to drive interstate.[17] In 2009, the percentage of the transit division's revenue that came from interstate

---

[16] Plaintiffs argue that the audit of a non-opt in transit driver is irrelevant to this case. However, as will be explained later, I find that it is relevant.

[17] Plaintiffs argue that the frequency of interstate transit trips taken by all transit drivers is irrelevant, and the only facts that matter are the number of interstate trips plaintiffs actually took. (Pls.' Br. at 9.) Plaintiffs, however, admitted at oral argument that any plaintiff could be called upon to drive any interstate transit route, and would face discipline if they refused to drive the assigned route. (Oral Argument at 11:48-49 (E.D. Pa. Mar. 8, 2013), ECF No. 56.) Accordingly, I conclude that the overall number of interstate trips for all transit drivers is relevant to the inquiry of whether plaintiffs were likely to be required to drive interstate, because plaintiffs were as likely as the other transit drivers to be assigned KCI's interstate routes.

Finally, the cases that plaintiffs' cite to show that the activities of non-plaintiff drivers' are irrelevant are inapposite. The court in *Arranda v. Southwest Transport Inc.*, never discussed

routes was 8.4, in 2010 it was 9.7, in 2011 it was 1, and in 2012 it was 5.3. (Def.'s Facts ¶¶ 66-69; Pls.' Resp. to Def.'s Facts ¶¶ 66-69.) *See Songer*, 618 F.3d at 476 (detailing that the amount of loads defendant transported across state lines was 2-3% of total loads transported, and stating that this was evidence that plaintiffs who had not driven interstate could reasonably have been expected to drive interstate.)

Accordingly, plaintiffs' argument that defendant is not entitled to the motor carrier exemption for plaintiffs, because a number of plaintiffs never traveled interstate or traveled interstate infrequently is not enough to defeat summary judgment. As explained above, the relevant question is not whether all plaintiffs have driven interstate, but whether they could reasonably have been expected to drive interstate. Defendant has establishing through undisputed facts that all transit drivers, including plaintiffs, could be assigned an interstate route. While these select plaintiffs happened to have been called upon to drive interstate rather infrequently during the relevant time period, that does not change the fact that the plaintiffs were subject to driving interstate at all times, and were reasonably likely to do so based on KCI's interstate routes. *See Morris*, 332 U.S. 422 at 433 (all drivers held exempt even though two never drove

---

the relevancy of non-party plaintiffs' activities. 2012 WL 882635, *7 (S.D. Fla. Mar. 15, 2012). In that case the court determined that the plaintiff was not exempt because he had never crossed state lines for his job or agreed to cross state lines for his job. *Id.* Additionally, during the plaintiffs period of employment the employer only crossed state lines five times. *Id.* The facts in *Almy v. Kickert School Bus Line*, 2013 WL 80367 (N.D. Ill. Jan. 7, 2013) are also significantly different than the facts in this case. In *Almy* the plaintiffs were exempt because their regular driving routes took them in interstate travel, and thus the court did not need to discuss whether plaintiffs were likely to be required to drive interstate. *Id* at *17. Accordingly, it was irrelevant in *Almy* whether other drivers frequently drove interstate, because the plaintiffs frequently drove interstate– a fact that the plaintiffs in that case provided no evidence to contest. *Id.* Finally, *Ibea v. Rite Aid Corp*, discussed the relevance of non-opt ins for certifying a class, not for the motor carrier exemption, and thus is not relevant to this case. *Ibea v. Rite Aid Corp.*, 2011 U.S. Dist. LEXIS 144652 (S.D.N.Y. Dec. 14, 2011).

interstate); *Songer*, 618 F.3d at 475 (all drivers held exempt although many had never driven interstate.) Finally, although it may seem strange that all plaintiffs are exempt given the infrequency with which they drove interstate, as the Tenth Circuit has noted "it is not the amount of time an employee spends in work affecting [interstate] safety, rather it is what he may do in the time thus spent, whether it be large or small, that determines the effect on safety. Ten minutes of driving by an unqualified driver could do more harm on the highway than a month of driving by a qualified one." *Starrett v. Bruce*, 391 F.2d 320, 323 (10th Cir.1968). Thus, the motor carrier exemption bars plaintiffs' FLSA claims. Based on the undisputed facts and plaintiffs' version of any disputed facts, defendant is entitled to judgment as a matter of law.

**IV.     Conclusion**

For the reasons explained above, I will grant KCI's motion for summary judgment on plaintiffs' FLSA claims. An appropriate order follows.