UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

```
JOSEPH RESCH, On Behalf of      )    11-CV-6893
Himself and Others Similarly    )
Situated,                       )
                                )
                                )
             Plaintiffs,        )
                                )
                                )
        vs.                     )
                                )
                                )
KRAPF'S COACHES, INC.,          )
                                )    Philadelphia, PA
                                )    August 21, 2013
             Defendant.         )    10:56 a.m.
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE WILLIAM H. YOHN, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          R. ANDREW SANTILLO, ESQUIRE
                             WINEBRAKE & SANTILLO, LLC
                             Twining Office Center, Suite 211
                             715 Twining Road
                             Dresher, PA  19025


For the Defendant:           RANDALL C. SCHAUER, ESQUIRE
                             FOX ROTHSCHILD LLP
                             747 Constitution Drive, Suite 100
                             Exton, PA   19341


Audio Operator:              A.J. FOLLMER


Transcribed by:              DIANA DOMAN TRANSCRIBING
                             P.O. Box 129
                             Gibbsboro, New Jersey  08026-0129
                             Office:  (856) 435-7172
                             Fax:     (856) 435-7124
                             E-mail:  dianadoman@comcast.net




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1                           I N D E X

2    ARGUMENT:                                    PAGE

3    Re: Continuum of Movement

4       By Mr. Schauer                                7

5       By Mr. Santillo                              12

6    Re: Employees

7       By Mr. Santillo                   16, 35, 45

8       By Mr. Schauer                        18, 44

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Colloquy                                        3

1          (The following was heard in open court at 10:56 a.m.)

2                THE COURT:  You may be seated.

3                MR. SCHAUER:  Thank you, Your Honor.

4                THE COURT:  Excuse me.  Well, that's not a good

5    start.  Okay.  Who do we have representing the plaintiff here?

6                MR. SANTILLO:  Good morning, Your Honor.  Andy

7    Santillo from Winebrake and Santillo.

8                THE COURT:  Okay.  And for the defendant?

9                MR. SCHAUER:  Good morning, Randall Schauer from Fox

10   Rothschild.

11               THE COURT:  All right.  I have some questions in the

12   beginning -- excuse me -- that I want to clarify things and

13   then we'll get to the -- the main issues.

14               It's never specifically stated, but the FLSA is

15   administered by the Department of Labor and the exemption is in

16   the Fair Labor Standards Act and the question then is whether

17   that applies?  And if it does then the jurisdiction is -- is in

18   the Department of Transportation with the Secretary of

19   Transportation.  Now, that's my understanding.  Okay.

20               If the exemption does apply does the Department of

21   Transportation have any regulations concerning overtime pay or

22   wages in general or just has the maximum --

23               MR. SCHAUER:  I probably have more --

24               THE COURT:  -- hours?

25               MR. SCHAUER:  I may have more experience in that,

Colloquy                                    4

```
 1    Your Honor.

 2              THE COURT:  Yes.

 3              MR. SCHAUER:  I represent some trucking companies

 4    also.  No, there are no regulations that have been promulgated

 5    by the Department of Transportation relative to minimum wages

 6    or overtime hours.

 7              THE COURT:  Yes.  It would seem that it would be

 8    rather simple for them to decide that they should require

 9    overtime pay also.

10              MR. SCHAUER:  That's certainly within the discretion

11    granted to the Department.  They've chosen, obviously, not to

12    do that.

13              THE COURT:  Okay.

14              MR. SANTILLO:  That would be the plaintiff's

15    understanding as well, Your Honor.

16              THE COURT:  Okay.  Now, my next question is the

17    number of plaintiffs in the action.  You have -- both of you, I

18    think, have used 34.  When I counted up the number of

19    opt-in's on the docket I got 40, less five who opted out, which

20    means 35, plus Mr. Resch.  Are we sure the 34 number is

21    correct?

22              MR. SANTILLO:  That's, Your Honor -- Your Honor, I

23    would have to check the docket again, but my -- I've been the

24    one, sort of, keeping track of all this at my firm and we're

25    pretty confident that it's just the 34 individuals.
```

Colloquy                                    5

1          THE COURT:  Okay.  And you agree?

2          MR. SCHAUER:  I -- we did look at that also because

3    near the end we were exchanging information and discussing

4    this.  It's been a good relationship between counsel and I

5    believe 34 is accurate.

6          If I -- if I may, Your Honor, one other numerical

7    item you may have noticed in the brief -- and I apologize for

8    this and I can -- you know, it's there -- that is I refer

9    sometimes in the pleadings to 142 transit drivers total that

10   were employed during the applicable period.  Mr. Santillo

11   discusses 129 who received notice of the action.  The reason

12   for that discrepancy is there were 13 of the 142 who never

13   worked more than 40 hours in a given week and, therefore, did

14   not receive notice.

15         So you'll see sometimes I refer to 142 transit

16   drivers driving during the three year period looking back from

17   the date of the complaint.  The reason for that is, you know,

18   first is the 129 who received notice.  The reason for that,

19   I'll represent to the Court, is because the other 13 did not

20   drive over 40.

21         THE COURT:  Okay.  All right.  And the defendant has

22   -- oh, on the 34 just check and if there is any discrepancy let

23   me know by letter.

24         MR. SANTILLO:  Certainly, Your Honor.

25         THE COURT:  If you still agree on 34 then you don't

1    have to do anything.

2              MR. SANTILLO:  Thank you.

3              THE COURT:  Okay.  And as I read the papers the

4    defendant has not sought the dismissal of the Pennsylvania

5    Minimum Wage Act claims?

6              MR. SCHAUER:  Your Honor, I would amend, if you will,

7    my brief.  Counsel did note that.

8              I -- the Pennsylvania minimum wage law does have a

9    similar exemption, if you will, to the requirement of the

10   Pennsylvania wage law that says if the employees are subject to

11   the jurisdiction or regulation of the Department of

12   Transportation they are exempt and so, yes, I -- I would amend

13   my brief.  The arguments are the same.  The issues are the

14   same.  There is no, that I'm aware of -- any kind of separate

15   body of jurisprudence in Pennsylvania relative to this

16   particular issue.

17             THE COURT:  Okay.  Well, I'll need something in

18   writing on that.  Why don't you wait until we see how this

19   motion comes out and then you -- if there is a need for that

20   you can file something at that point just referring to your

21   brief or however you want to do it in the minimal way.

22             MR. SCHAUER:  Will do, Your Honor.

23             (Pause)

24             THE COURT:  Okay.  Now -- and we are talking here

25   about the Transit Division only since that's the class that was

 1    conditionally certified.

 2            Now, the first substantive question I have is in

 3    terms of the continuum issue.  It seemed to me that the <u>Packard</u>

 4    case pretty much put that to rest.  Is there -- is there any

 5    claim of continuum here to get them into interstate commerce?

 6            MR. SCHAUER:  There is, Your Honor.

 7            THE COURT:  Okay.  And why did the <u>Packard</u> case not

 8    dispose of that issue?

 9            MR. SCHAUER:  The <u>Packard</u> case, as you know, a Third

10    Circuit case, involved a -- what was called access.  It was a

11    service in Pittsburgh similar to yet another division under the

12    Krapf umbrella which is known as Rover.

13            What access does is somebody, you know, elderly

14    individuals or those who have medical needs, essentially those

15    who are -- the service is funded by the Pennsylvania Lottery,

16    can call and schedule a pick-up a day in advance.  It's similar

17    to a something of a taxi service.  That was the company that

18    was at issue in <u>Packard</u>.

19            If you read the language of <u>Packard</u> you see that they

20    discuss it in that context.  Some of the other -- you know,

21    what we found to be useful in <u>Packard</u> and applicable to our

22    situation, Your Honor, for example, in <u>Packard</u> they said well,

23    this isn't a situation -- and I don't remember the case they

24    cited -- but within that opinion they said this is not a

25    situation such as in Washington, D.C. where the issue was a

1    service that was open to anybody who wanted to use it that

2    transported individuals between subway stops or the train

3    station and another train station.

4          In this case, you know, I think that the language of

5    Packard, you know, and the -- frankly the -- distinguishing it

6    from what was the service that was actually involved there,

7    brings our continuum cases.

8          For example, the routes that stop at the PATCO line

9    down at Eighth -- near Eighth and Chestnut or in that area,  we

10   have routes that stop there.  They go to the Philadelphia Navy

11   Yard.  We have routes that go to SEPTA stops, we have routes

12   that go to other places.  They're really available for, you

13   know, maybe not the universe of individuals, but for whoever

14   who wants to use them to get to the Philadelphia Navy Yard that

15   -- that's funded by the businesses at the Navy Yard that run.

16         We have other runs that stop -- you know, for

17   example, the Villanova runs that go to the -- from the SEPTA

18   stops and also then to train stations.  That's different then,

19   you know, the cases -- or excuse me, the service that was

20   involved in Packard.

21          Packard -- I think the useful language in Packard is

22   it -- it talks about the continuum, the essential character of

23   the movement.  What's the essential character of the movement?

24   And what they said is, in Packard, they go well, as to the

25   access service involved here it's one person from their house

1    to some place else.  There wasn't even any evidence in what I -

2    - what I find in these cases is often times there doesn't seem

3    to be near the record developed for the Court as in this case.

4    They didn't even have a record there of the number of times

5    that an access trip, if you will, went to a train station, the

6    airport in Pittsburgh or some other, perhaps, hub.

7            THE COURT:  They said the delivery to the railroad

8    station or the airport was not enough for a continuum.

9            MR. SCHAUER:  Well, they said by itself -- by itself,

10   based upon, I suggest, the facts of Packard which are very

11   specific one-off, you know.  Well, you know, these people --

12   they didn't even have -- they didn't even have information.  I

13   mean, it sounds like the record in Packard was something along

14   the lines of well, if someone calls and they want to go to the

15   airport they can do that.  I think that's different than the

16   types of the runs --

17           THE COURT:  Okay.

18           MR. SCHAUER:  -- or routes here.

19           THE COURT:  Well, which run here do you think

20   qualifies for a continuum?

21           MR. SCHAUER:  There is what we call the Philadelphia

22   Navy Yard, which stops at the PATCO stop, if you will, down

23   again at Eighth -- around Eighth and Walnut or Chestnut,

24   somewhere in that area.

25           THE COURT:  So you're talking about a trip from the

1    Navy Yard to PATCO?

2             MR. SCHAUER:  Or -- yes, or from -- from --

3             THE COURT:  Well, how is that different from a ride

4    from your office to the airport?

5             MR. SCHAUER:  Well, it's different in the sense that

6    it all -- one of the other -- it goes both ways and so

7    individuals who chose to come across from New Jersey use it to

8    go down to the airport.  They don't have to call ahead.  It's

9    generally available.  It's not specifically designated --

10            THE COURT:  But they might also live in Center --

11            MR. SCHAUER:  -- continues the movement.

12            THE COURT:  They might also live in Center City.

13            MR. SCHAUER:  They may.  They may, but that doesn't

14   mean that it's not available and a continuum for interstate

15   transportation of individuals or travel.  So there's -- it's

16   at -- I'm sorry, Tenth and Filbert is the PATCO station.  I'm

17   corrected.

18            We have -- Parkway run goes to, I believe, the

19   Amtrak stations and also to the PATCO line.  The SEPTA --

20   they're described, and I don't have them memorized, Your

21   Honor, but they are described I think in MSJ-1, which is the

22   listing of where routes go and what they do.  So I apologize I

23   don't have the specific list of which ones go exactly to those

24   locations, but it is in the record.

25            And I think that -- I don't think -- I think that

1    Packard, if anything, supports that by contrast to the facts

2    of -- a lack of facts in Packard that these are legitimate

3    continuum runs, i.e., in the sense of interstate commerce.

4           There's also the Wyndham run which is very clearly a

5    run from the Wyndham Hotel.  Mr. Resch drove this for about

6    four months once a week according to his deposition.  You

7    know, it goes from the Wyndham Hotel to the airport.

8           The cases that I have seen, you know, there's, you

9    know, plaintiff's counsel will cite and say, well, there's no

10   specific agreement with Southwest Airlines to transport their

11   passengers, et cetera, but even as Resch testified, the

12   passengers on there are people who have been stranded, who

13   are, you know, going -- taking a trip to the airport and

14   leaving the next day, et cetera.  I believe, you know, that

15   that's a good example of also a continuum run that's --

16           THE COURT:  But --

17           MR. SCHAUER:  -- available.

18           THE COURT:  -- Packard specifically said that a

19   delivery to the railroad station or the airport is not enough.

20   I don't understand how you get around that or how you think

21   you get around it?

22           MR. SCHAUER:  I think I've pretty much done my best.

23   I won't bend your ear any further.

24           THE COURT:  Okay.

25           MR. SCHAUER:  But I -- I do believe that if you read

1    the entire case and you specifically look at the record and

2    what was involved in that case it's very different.

3              THE COURT:  Okay.  Mr. Santillo, do you want to

4    speak on that issue?

5              MR. SANTILLO:  Plaintiff doesn't want to bend your

6    ear any more, Your Honor, than it already has, but I will say

7    that I mean as counsel acknowledged our reading of _Packard_ is

8    much different than his and that this practical continuum of

9    movement that the Third Circuit identified is not present

10   here.

11             As the Court acknowledged, just dropping someone off

12   at a train station -- and counsel mentioned like dropping

13   someone off at a SEPTA station, there's no certainty that that

14   passenger is going to go out-of-state.  They could get dropped

15   off at the R-5 line at the Villanova stop and could just go

16   two more down down to the Ardmore stop.  That's not interstate

17   travel.

18             And there is no -- and the cases -- I know the

19   _Packard_ Court didn't adopt this joint ticketing arrangement,

20   but they did cite it and recognize it that no such arrangement

21   existed where someone who is getting picked up by, in this

22   case a transit route, would say, okay, I know this a part of a

23   continuation of my trip in interstate commerce.

24             THE COURT:  Well, they actually said that even that

25   would not be enough to meet the standard.

1          MR. SANTILLO:  Precisely, but I think that's --

2     that's what -- that would not be sufficient and there is no

3     evidence here that -- that the Transit Division has made any

4     arrangements or is any part of such a continuation.

5          (Pause)

6          THE COURT:  Now, in terms of the employer in the

7     Morris case, they said four percent in interstate commerce is

8     enough to merit the exemption in terms of the employer's

9     responsibility and in this case as I counted out the numbers

10    for the most part it's -- it's over four percent.

11         So it seems to me that in terms of the defendant,

12    Krapf, that they are in interstate commerce.  It's more a

13    question what is the standard with reference to employees --

14    specific employees.

15         MR. SANTILLO:  That is correct, Your Honor.

16    Plaintiff's are not opposing the assertion that the -- Krapf,

17    as a defendant, qualifies as a motor carrier as one of the

18    three requirements as part of the exemption.

19         Our position strictly is that the transit -- the 34

20    transit drivers who are parties to this case have not

21    participated in interstate commerce a sufficient amount to

22    qualify for this exemption and thus be overseen by the

23    Department of Transportation versus the Department of Labor.

24         THE COURT:  Okay.  Now, in that Krapf's has a

25    certificate of public convenience and necessity does that, per

1    se, mean that they are in interstate commerce and that the

2    Department of Transportation has the power to regulate their

3    maximum hours?

4              MR. SANTILLO:  I think you're referring to the

5    drivers, not -- not Krapf's Coaches.

6              THE COURT:  No.  I'm talking about the Krapf's

7    Coaches, Inc. first.

8              MR. SANTILLO:  I mean, I think that the defendants

9    established a record that Krapf's Coaches, Inc. is -- is

10   regulated by the Department of Transportation, but it, again,

11   as the Court acknowledged, recognized whether the drivers

12   actually qualify is a separate and completely distinct issue.

13             THE COURT:  Okay.

14             MR. SCHAUER:  May I speak?

15             THE COURT:  Okay.

16             MR. SCHAUER:  I think Your Honor has --

17             THE COURT:  Well, he's already given it to you.

18             MR. SCHAUER:  Excuse me.

19             THE COURT:  He's already given the issue to you, but

20   if you would like to speak you're entitled to it.

21             MR. SCHAUER:  No, if that's -- if that was the only

22   issue then I would only note that, again, in a lot of the

23   cases you did not see evidence of that kind of, you know,

24   maintenance of itself as a interstate carrier in interstate

25   commerce even down to the level of requiring all of its

1    drivers to be able to participate in interstate transit by

2    making sure they have all the correct certifications, doing

3    the drug testing, doing the certifications.  That's all I

4    would note.

5              THE COURT:  I guess my specific question was is the

6    certificate of public convenience and necessity, is that a

7    Federal certificate or a State certificate?  I don't know

8    enough about this, but it seems to me I've heard in the past

9    that the State PUC issues things like that.

10             MR. SCHAUER:  I believe in this instance that

11   document is a PUC issued document that's given to Krapf's.

12   You know, more importantly, I believe KCI has operated under a

13   U.S. DOT license since 1983.

14             And I think even more significantly, which I think

15   was touched upon by Mr. Santillo, this isn't a theoretical

16   discussion I would suggest.  The fact is that DOT audits and

17   has audited -- and there's information in the record -- the

18   operations of KCI and, in fact, including the activities of

19   its drivers.

20             THE COURT:  Okay.  All right.  So I guess the answer

21   to my question is the certificate of public convenience and

22   necessity is not, per se, enough to put them in the category

23   of an interstate carrier --

24             MR. SCHAUER:  I think that's --

25             THE COURT:  -- but these other things do?

1          MR. SCHAUER:  Yes.  Taxi service in Williamsport may

2     not -- that probably would not be enough to make it an

3     interstate carrier.

4          THE COURT:  Okay.  Now the next question, and where

5     we get to the real meat of this, is what about the employees?

6     I must admit that when I started to read this, making these

7     decisions based on each individual employee seemed to me a

8     ridiculous concept, but then I read the cases and that's what

9     they do.  Do you want to speak to that, Mr. Santillo?

10          MR. SANTILLO:  Certainly, Your Honor.  I think this,

11     sort of -- if I could take a step back this goes to the idea

12     that these exemptions, as the Court recognized in the

13     VanStory-Frazier case, the exemptions are to be read narrowly

14     in part because of the humanitarian nature of the FLSA and the

15     benefits that it provides workers to -- to provide them

16     overtime wages when they work excessive hours, but also to,

17     sort of, spread work among several employees by providing a

18     disincentive to employ -- a disincentive to only hire a few

19     employees, but rather hire more to fill the hours.  And

20     because of that the Third Circuit of the Supreme Court, and as

21     yourself recognized in VanStory, the exemptions are to be read

22     narrowly and an individual would have to fit plainly and

23     unmistakably within those exemptions.

24          Here we have a relatively small class of 34

25     individuals.  We also don't have a hypothetical idea of

1   individuals testifying at deposition just estimating, oh, I

2   think I went over once every two months or I went over once a

3   week.  We have the data.  We have a sample size of

4   approximately 1,400 -- 14,000 trips to show what each

5   individual did during the relevant period in terms of crossing

6   state lines and so that determination can be made.

7             And also I note in our brief we cite to the cases of

8   Almy and Arranda.  Almy out of the Northern District of

9   Illinois and Arranda out of the Southern District of Florida.

10  Each of those were very -- they were individual cases, granted

11  the Almy case had multiple plaintiffs.  And in each case the

12  defendant tried to say, well, look what everybody else is

13  doing, that's what the Court should consider.

14            And in Arranda they -- that was specifically

15  rejected as to that -- that kind of an analysis should be part

16  of the Court's consideration.  It should be looked at

17  specifically, the actions of the individual, and whether they

18  were in interstate commerce.  And that is -- and that also was

19  backed up by the Fourth Circuit in Troutt.  So that, I think,

20  sort of, lends itself to why the individual analysis has to be

21  done.

22            Now, here the Court doesn't have to presume oh,

23  well, five of the 34 testified and five of the 34 said they

24  rarely, if ever, went out.  Here we have the data, so a

25  determination can be made based on the objective number.

1              THE COURT:  Do you make this analysis with reference

2       to each employee?

3              MR. SCHAUER:  No, oh contraire --

4              THE COURT:  What --

5              MR. SCHAUER:  -- Your Honor.

6              THE COURT:  What do you think?

7              MR. SCHAUER:  If you notice, I did not file a motion

8       to decertify the class.  If I thought that that was the

9       analysis to be made I would have made a motion to decertify.

10             My reading of the cases -- and this is the third

11      case that Mr. Santillo and I have been involved in relative to

12      a Krapf entity, so we've looked at it before --

13             THE COURT:  It's the --

14             MR. SCHAUER:  My reading of the --

15             THE COURT:  -- same issues?

16             MR. SCHAUER:  Different division, same issues.

17             THE COURT:  Who won?

18             MR. SCHAUER:  Well, the cases were settled, so --

19             THE COURT:  That's what I like to hear.

20             MR. SCHAUER:  They were settled.  There was a --

21             THE COURT:  Wait.  Hold on one second.

22             THE CLERK:  This isn't recording.  It just stopped.

23      I don't know what the problem is, Judge.  It's freezing.

24             THE COURT:  Okay.

25             THE CLERK:  It's coming in and out.  Call the IP and

1    try --

2              THE COURT:  Get it fixed.  Yes.  Okay.  Apparently,

3    our recording device is frozen.  That's why some Judges have

4    court reporters.

5              (Recess taken, 11:18 a.m. to 11:41 a.m.)

6              THE COURT:  You were telling me about the employees.

7              MR. SCHAUER:  Yes, Your Honor.  I, you know, have

8    argued --

9              THE COURT:  First, as a minor aspect, should we be

10   talking about the plaintiffs in this action or should we be

11   talking about all transit employees?

12             MR. SCHAUER:  I believe we should be talking about

13   -- because of the nature of the exemption at issue we should

14   be looking at all of the employees of the Transit Division,

15   Your Honor.

16             THE COURT:  Okay.  Mr. Santillo, do you agree with

17   that?

18             MR. SANTILLO:  No, Your Honor.  I disagree.

19             THE COURT:  Okay.

20             MR. SANTILLO:  And, if I may, I just wanted to

21   correct a misstatement I made earlier.  I cited to the Arranda

22   opinion about how it has to be an individual analysis.  It's

23   actually the Dauphin opinion and --

24             THE COURT:  Okay.

25             MR. SANTILLO:  -- and Troutt, but, Your Honor --

1           THE COURT:  Okay.  Well, if you disagree I'll give

2      you a chance.

3           MR. SANTILLO:  Okay.

4           THE COURT:  I interrupted him.  I just thought it

5      might be something that both of you would agree on.

6           MR. SANTILLO:  No.

7           MR. SCHAUER:  And, Your Honor, the <u>Dauphin</u> and

8      <u>Arranda</u> cases that were cited in the brief in opposition to

9      the motion are addressed in the reply brief and so I won't go

10     into the details of why we believe those cases don't apply,

11     but we think there's good reason why they don't and that's

12     stated there.

13          I think on the question of what, you know, do we

14     look at the individual employee and/or even do we look at the

15     subclass of transit drivers who happen to opt into this case,

16     I think where you have to begin with, again, is to remember

17     what we're talking about here is an exemption that is not like

18     the, you know, exemption -- the blue collar exemptions, the

19     administrative professional, that kind of exemption that's

20     defined by the Department of Labor.

21          Rather we're talking about an exemption that is

22     defined outside of the Fair Labor Standards Act and that is

23     it's defined in the Federal Motor Carrier Safety Act relative

24     to the jurisdiction of the Department of Transportation.

25          And so on a more global sense if you were to allow,

1    for example, simply the group that decides to opt-in -- and it

2    was an interesting result with regard to the relative

3    percentages of the opt-in versus non-opt-in and out-of-state

4    -- but if you allow them to determine whether the Department

5    of Transportation has jurisdiction over the operations of the

6    Transit Division that makes no sense.   I mean, it doesn't --

7    it doesn't make any sense.

8              In other words, the Department of Transportation has

9    jurisdiction over the operations of the Transit Division or it

10   does not.   And what you look at is then -- it's already been

11   agreed that the Transit Division is an interstate -- is

12   involved in interstate commerce.

13             And then what the cases talk about, and what the

14   regulations under the Department of Transportation -- the MCA

15   exemption talk about is, you know, what -- you look at the

16   general -- even when an -- when employees of a motor carrier

17   engage in interstate commerce during a minority of their time

18   the MCA exemption still applies due to the jurisdiction that

19   the responsible Federal agency has over setting the employees

20   qualifications and maximum hours of service.

21             You'll see cases that go we aren't going to get

22   involved in a overly technical counting of hours.   When you

23   see the cases around the four percent I suggest to you that

24   what the cases are looking for there in Morris, to go back to,

25   kind of, the seminal United States Supreme Court case on the

1    issue, what the Court's are looking for there is it more than

2    de minimis?  You know, we're not going to look at every

3    employee to decide.

4            THE COURT:  It seemed to me <u>Morris</u> was more about

5    the employer rather than the employees.

6            MR. SCHAUER:  It was, but subsequent cases, I think,

7    you know, what I've seen in handling these types of cases,

8    that is MCA exemption cases under the FLSA in a class action

9    context, generally the four percent seems to have been

10   accepted in other cases as, you know, if the -- if the routes,

11   or here we have also revenue, exceed four percent of the route

12   then the MCA will apply for the division in which these

13   employees are employed.

14           I mean, they talk about what you need to look at is

15   the -- you look at the nature of the employment and you look

16   at is there a reasonable, you know -- if an employer can

17   establish that any driver in a particular group can be called

18   upon at any time to drive an interstate route the Secretary of

19   Transportation's regulations will govern that -- that group.

20   The appropriate test is whether a driver had reasonable

21   expectation of being asked to perform.

22           There's no, I suggest, dispute, including based on

23   the depositions of five of the opt-in plaintiffs, that they

24   understood that they may well be assigned.  I mean, it's kind

25   of interesting --

1          THE COURT:  Not so.

2          MR. SCHAUER:  -- even in the --

3          THE COURT:  There were some -- some depositions that

4    -- where they said they had the privilege of rejecting

5    assignments and they didn't have to take an interstate

6    commerce assignment.

7          MR. SCHAUER:  I think, Your Honor, those -- that

8    deposition testimony related to taking charter assignments and

9    I haven't even talked about that.  In other words, someone

10   operated -- operated out of the same building at Krapf's

11   Coaches is a transit and a charter division.

12          The charter's are what they sound like.  They're

13   one-off Hershey Park and back, New York City and back, what

14   have you.  That's the Charter Division.  That testimony -- I

15   read it this morning in preparing for this argument -- that

16   testimony had to do with an opt-in plaintiff who testified

17   that, you know, he was not subject to being assigned charter

18   work.

19          In fact, one of the opt-in plaintiffs, if I'm not

20   mistaken, and a dispatcher for the Transit Division at Krapf,

21   testified that on occasion they will assign, during the

22   regular work day, a transit driver to work in the Charter --

23   Charter Division because of simple manpower or person power

24   requirements.

25          So, no, that -- there is no -- there's no right.

1   This -- you know, there's no Union contract and, in fact, I

2   believe the testimony's fairly clear and not disputed that,

3   you know, any employee subject to being assigned to such route

4   as is necessary.  There's testimony that they're cross

5   trained.

6          THE COURT:  Must take it or they're fired?

7          MR. SCHAUER:  Well, they're subject to discipline --

8          THE COURT:  Yes.

9          MR. SCHAUER:  -- if they refuse a route.

10         THE COURT:  Okay.  Mr. Santillo, do you agree with

11   that in terms of the transit employees?

12         MR. SANTILLO:  I agree, Your Honor, that the

13   defendant is -- their company has put out there that people

14   could -- could be put on an interstate route.  I think what's

15   important here, though, we have the objective data of whether

16   they actually were.  We have a --

17         THE COURT:  Okay.  Well, I just asked you whether

18   you agree.  Do you agree that the transit employees could be

19   assigned to interstate commerce and they could not refuse to

20   take that route?

21         MR. SANTILLO:  I -- I agree that the drivers could

22   be subject to discipline if they didn't listen to their --

23   listen to the instructions from the defendant.

24         THE COURT:  To their assignment?

25         MR. SANTILLO:  To their assignment.

1          THE COURT:  Okay.

2          MR. SANTILLO:  But I -- but the objective data shows

3    that an overwhelming majority of the time almost over 95 --

4          THE COURT:  We'll get to your argument.  I just

5    wanted, you know --

6          MR. SANTILLO:  Certainly.

7          MR. SCHAUER:  And so, once again, you know, I think

8    it, kind of, is inconsistent, I guess, is probably the most

9    appropriate way to describe it, to suggest that well, because

10   in this case we have this subset of transit drivers who happen

11   to opt-in that the Department of Transportation, that would

12   otherwise have the power to regulate the operations of the

13   company, including these individuals, you know, it doesn't --

14   it doesn't apply.

15          I thought -- frankly, I thought it was somewhat

16   instructive that of the opt-in plaintiffs more than half did

17   drive out-of-state.  More than half did drive out-of-state.

18   I think that speaks fairly strongly to -- and addresses the

19   other numbers that, you know -- the cases have said it doesn't

20   matter if some of the drivers within the class never even went

21   out-of-state.  It doesn't even matter, you know, if -- it

22   doesn't have to be some super majority.

23          Again, you look at the nature of the operations and

24   what are they going to -- what can they reasonably be expected

25   to -- called upon to do.  I believe we have established

Schauer - Argument                                                26

1    certainly that the interstate operations of this entity, the

2    Transit Division, by being over that four percent threshold as

3    a whole is a -- is subject to the regulations and jurisdiction

4    of DOT.

5              And even more so, something that I haven't seen in

6    any of the cases is the fact that DOT has sanctioned Krapf

7    because of activities of a transit driver in the Transit

8    Division on a transit route for failure to keep certain

9    records.

10             THE COURT:  Do we have numbers on the percentage of

11   interstate commerce routes that the plaintiffs in this case

12   have driver?

13             MR. SCHAUER:  I believe -- I believe we do.  Yes,

14   I --

15             THE COURT:  Are they over four percent?

16             MR. SCHAUER:  Those are not.  Those -- those were

17   not over four percent.  If you look at the -- and the

18   information's all in there to do it all sorts of ways.  No, it

19   is not.

20             I would suggest to you also that the opt-in

21   plaintiffs -- it's a relatively smaller sample of total routes

22   driven over the three years by all employees, it's pretty

23   small -- and so, yes, in other words, what's -- you know,

24   another solution you were talking about, you know, if Krapf

25   were to adopt a policy that said, you know, everybody has got

1  to go out-of-state -- which I suggest they have policy in

2  place and it's understood per the prior discussion with

3  counsel as well as the record -- this way they -- what they

4  would do is, well, okay, every other week we're going to make

5  sure that every driver drives out-of-state.  They could do

6  that.  They have -- they have the routes available now.

7          You know, remember, we're looking at this in this

8  broad aspect -- broad kind of over big number -- 142

9  employees, 129.  On a given day over the last three years

10 they've only run -- they only have like 16 routes at a time.

11 They only have 16 assignments, if you will, 16 to 21

12 assignments over that period on any daily basis and they've

13 had 36 to 62 employees.

14         So if, you know, if you, kind of, think of it -- and

15 some of the cases have suggested this.  This is the case that

16 I used in some of the prior ones where the percentage of

17 interstate was more like .1 percent, you look -- they go --

18 look at you're going to work at Krapf's what's your

19 expectation for that day of possibly going out-of-state.

20         Well, if we have -- let's cut them in the middle say

21 40 employees and we've got 20 routes and two of them are going

22 out-of-state, you got a chance -- one in 10 chance of being

23 assigned to an out-of-state route that day.  That's a 10

24 percent opportunity depending upon, of course, who gets sick,

25 who's not sick, who may get called to something else.

1           So, you know, to allow some -- you know, somehow the

2     individuals or the fact that a given individual -- and I don't

3     think the cases support this -- may or may not have been

4     involved in out-of-state commerce or some set relative to the

5     application of the exemption of the regulation of DOT.  DOT

6     does regulate them.  They are -- they are in interstate

7     commerce for purposes of DOT regulation under the law and so,

8     therefore, the exemption applies, you know, because of --

9               THE COURT:  You said that --

10              MR. SCHAUER:  -- because of the overall what -- what

11    activities of the organization.

12              THE COURT:  Yes.  You said that I should look at all

13    the transit employees, not just the plaintiffs.  What case

14    supports that?

15              MR. SCHAUER:  I -- I haven't seen any -- frankly, I

16    haven't seen any cases that specifically discuss looking only

17    at the plaintiffs or the entire organization, but the cases

18    I'm talking about is -- they look at the operations of the

19    employer.  They look -- and they also look at what -- they

20    don't say what are the odds that those who have opted into the

21    class will drive out-of-state.

22              They, you know -- they're just -- it's like one of

23    those points that I haven't even seen it discussed because

24    frankly I think it's -- I was kind of surprised by that

25    argument.  It's subsumed in the way that the cases and Courts

1    approach it -- approach it.  I haven't seen a case that says

2    this percentage of the opt-in plaintiffs did this versus this

3    percentage.  The discussion is of employees.

4             During the break and since the briefs were filed,

5    you know, since we've been given notice of this argument

6    there's kind of -- there's an interesting cases that discusses

7    this issue generally.

8             And I'm -- I won't go into it, but if I could it's

9    from the United States District Court in Idaho where they do

10   talk about the issue of individual employee activities versus

11   group.  It's called Strum -- or Sturm, excuse me, S-T-U-R-M,

12   versus C.B. Transport.  I'm not sure what's the important

13   citation now that it's not F.2d and 3d, but I'll read it off.

14   2013 W.L. 1867075, if that's helpful.  2013 W.L. 1867075 and

15   they discuss this -- this issue.

16            And, in fact, in that case -- and I'm not going to

17   go into the details, per se, but in that case it was haulers

18   of milk where four -- they gathered, I take it, milk or

19   transported milk in the State of Idaho, gathering it partially

20   from farms and partially transporting it within Idaho between

21   facilities that did whatever they do to milk, pasteurize it

22   and treat it.  The --

23            THE COURT:  I presume they bottle it.

24            MR. SCHAUER:  I think they probably -- being from

25   York I should know these things, but I -- so, anyway, there's

1   certainly enough around the area.  Anyway, the -- what the --

2   in that case the Court actually did find that the exemption

3   applied.  You know, four percent of the trips were interstate

4   and also they transported milk from in and out-of-state as in

5   between.

6          And, again, they looked at the -- well, you know,

7   they emphasized with regard to the issue of -- it's one of the

8   more direct discussions of this point -- they emphasized, you

9   know, you need to look at, kind of, what are the operations of

10  the employer vis-a-vis the expectations of the employee,

11  somewhat like you talked about.

12         And I believe, you know, to go -- well, you know,

13  because these three, four individuals opted in we only look at

14  their experience relative to this exemption -- the motor

15  carrier exemption.  It may be different, you know.  I haven't

16  look at it and this isn't a case with respect to, for example,

17  the, you know, administrative exemptions or those types of

18  exemptions.

19         You know, if, in fact, that were the case, you know,

20  I'd suggest to Your Honor this case would be more amenable to

21  a decertification.  As I mentioned, you know, given what I

22  view as the law I believe that it's appropriate to consider

23  the entire operation, you know, because that's what they could

24  be doing whereas in -- often times where I've seen

25  de-certifications in the other exemptions it's because --

1   well, Denny's manager did something different or Etaldo's

2   (phonetic) own manager did something different, whatever, that

3   kind of thing, you know.

4            But here it's the operations and what they could be

5   assigned to, so I think -- I suggest that the -- you know, the

6   individual employee experience isn't -- doesn't control and

7   you look at the entire operations which are all the drivers

8   and what did they do, what did the operation do --

9            THE COURT:  Okay.  Well, that --

10           MR. SCHAUER:  -- during the time?

11           THE COURT:  Let me ask this question then.  In

12   Morris certainly -- and at least to me they seem to be

13   concentrating on the overall percentages of the company to

14   determine whether the employer qualified for interstate

15   commerce.  What is the statutory or regulatory reason why

16   we're looking at individual employees which some of these

17   cases do?  How do we get to that as an issue?

18           MR. SCHAUER:  Well, I -- I, frankly, did not read

19   that many -- you know, the cases will discuss individual

20   employees in the --

21           THE COURT:  I mean, there's one case I read that

22   said you had to look at each individual employee by what they

23   did each week.

24           MR. SCHAUER:  I'm going to suggest that those cases,

25   to my experience, again, may have been involving exemptions

1    other than the motor carrier.

2              THE COURT:  No.

3              MR. SCHAUER:  Okay.  Then under -- under the -- I

4    know under Arita (phonetic) there was testimony that there was

5    only -- there was no --

6              THE COURT:  But my question is --

7              MR. SCHAUER:  -- there was actually testimony that

8    they would not go out-of-state.

9              THE COURT:  -- why do we even get to considering

10   each individual employee?

11             MR. SCHAUER:  I don't think that we do.  I think --

12   I don't think that we do under Morris which has been adopted

13   by Packard, you know, look at the natural interval and your

14   inseparable parts of service.

15             THE COURT:  Well, there's certainly a lot of other

16   cases, District Court cases, since then that do look at the

17   individual employees and I think it comes from the

18   regulations, but I don't know exactly why and that's what I'm

19   asking you as to why?

20             MR. SCHAUER:  What also has -- I've seen out

21   there --

22             THE COURT:  Okay.  Well, do you know the answer to

23   the question or not?

24             MR. SCHAUER:  Well, some of -- some of the decisions

25   will cite the Department of Labor regulations interpreting the

1    power of the Department of Transportation.  And the fact is

2    the Department of Labor really doesn't have the power to

3    define the jurisdiction of the Department of Transportation.

4           I think, to my recollection, and I don't know what

5    cases that you looked at, but the ones I've seen that may go

6    to that level might be based upon -- there was a regulation of

7    the Department of Labor that said that well, with respect to

8    individual employees who do go out-of-state for the next four

9    months we'll treat them as -- in interstate commerce and,

10   therefore, exempt.

11          Well, that's -- that's, you know, there's decisions

12   out there that have also said no.  You know, maybe the

13   Department of Labor wants to look at it that way, but the fact

14   is they don't really define what the jurisdiction of the

15   Department of Transportation is.  The Federal Motor Carrier

16   Safety Act does that, so to that extent there may have been

17   discussions of it we cite this Department of Labor regulation,

18   but the -- you know, there's cases that say no.  They -- those

19   really don't have -- you know, where as they may in the

20   administrative area where it's Department of Labor's -- you

21   know, has been given the power, responsibility and authority

22   to define the various exemptions for, you know,

23   administrative, professional, et cetera, in this case we're

24   talking about -- and I think that's why it goes to the reason,

25   you know, you have to continue to go back to the basis of the

1    exemption which is the simple power of the Department of

2    Transportation to regulate.

3            THE COURT:  All right.  So the employees -- the only

4    basis you know of for the employees to be included, which is

5    the only basis I came up with, is the Department of Labor

6    regulation?

7            MR. SCHAUER:  That's the time I've seen it really

8    looked at where -- or cited in the regard otherwise the cases

9    tend to look at employees.

10           Now, obviously, they have to -- you know, here we

11   have certain examples, but they look at what -- you know, what

12   can the employees expect when they come to work.

13           And I think the other thing, you know, is, yes, you

14   have to think about it also both -- we look at it in the

15   global, but also on a daily basis.  You know, in other words,

16   what are these operations like?

17           Well, you have whatever number of employees and

18   that's why I did the graph that I did in the appendix which

19   says here's the -- here's the employees that were at Krapf on

20   any given month and here are the routes.

21           THE CLERK:  That's it.  That's it, Judge.

22           MR. SCHAUER:  Well, if that's the case I'll stop.

23           THE COURT:  Okay.  Mr. Santillo, I guess you get no

24   rebuttal.

25           THE CLERK:  It's going back and forth now, Judge.

1    It's stuttering, so to speak.

2            THE COURT:  Okay.

3            (Pause)

4            THE CLERK:  It's recording now.

5            THE COURT:  We're back on now?

6            THE CLERK:  Yes, it's recording.

7            THE COURT:  Okay.  Let's try it.

8            MR. SANTILLO:  I'll be very brief, Your Honor.  A

9    couple of points I want to raise.  One is --

10           THE COURT:  Let me ask some questions --

11           MR. SANTILLO:  I'm sorry.

12           THE COURT:  -- first --

13           MR. SANTILLO:  Certainly.

14           THE COURT:  -- that are troubling me.  Do you agree

15   it's the Department of Labor regulation that brings the

16   analysis of the employees into play?

17           MR. SANTILLO:  Yes, that is -- I do agree.

18           THE COURT:  Okay.

19           MR. SANTILLO:  29 CFR Section 782.2 specifically

20   subsection (a) says the analysis not only looks at the

21   employer, whether it qualifies as a motor carrier, but whether

22   the employees qualify as a motor carrier --

23           THE COURT:  Okay.

24           MR. SANTILLO:  -- and I know that that's land we've

25   covered.

1          THE COURT:  Now, then what about this issue of

2     whether the -- we should be looking now at the plaintiffs or

3     all employees in the Transit Division?

4          MR. SANTILLO:  I think it -- the case law is clear

5     that it should only be the plaintiffs.  In the case --

6          THE COURT:  Okay.  What case says that?

7          MR. SANTILLO:  There's two cases, one that I

8     misspoke earlier about, the <u>Arranda</u> case, and then the <u>Almy</u>

9     case and specific -- and these are some --

10         THE COURT:  <u>Olney</u>?

11         MR. SANTILLO:  <u>Olney</u>.  Yes.  We have -- we cite --

12         THE COURT:  O-L-N-E-Y?

13         MR. SANTILLO:  A-L-M-Y, Your Honor.  These are cited

14    in our brief on page 10.

15         THE COURT:  Okay.  I don't read District Court cases

16    before argument.

17         MR. SANTILLO:  Certainly.  The -- the --

18         THE COURT:  And what was the order one, <u>Arranda</u>?

19         MR. SANTILLO:  A-R-R-A-N-D-A.  Excuse me.  <u>Arranda</u>.

20    That full cite is 2012, U.S. District LEXIS, 34763.  That's

21    from the Souther District of Florida.  And the <u>Almy</u> case is

22    2013, U.S. District LEXIS, 1935.

23         THE COURT:  Okay.

24         MR. SANTILLO:  And, specifically, in our -- we put

25    in our brief in a parenthetical the <u>Almy</u> case said whether

1    other defendants, employees, indiscriminately shared
2    interstate routes or engaged in interstate transportation it's
3    not dispositive of whether plaintiff Almy and Rice engaged in
4    interstate transportation.  The only real question presented
5    is whether these plaintiffs, not all or some of their
6    co-workers, engaged in interstate transportation of
7    passengers.

8              And the <u>Arranda</u> case was a single plaintiff and,
9    again, the defendant there said well, other of my employees
10   went out-of-state, this individual didn't.  And the Court
11   rejected that and actually granted summary judgment in favor
12   of the plaintiff, a tow truck driver, to find that he was
13   entitled to overtime.  So that is our position in terms of the
14   -- it should be the opt-in's only.

15             Also, under the Fair Labor Standards Act you cannot
16   join this case unless you opt-in and file a form to join the
17   case and it's very specific.  The Rule 23 mechanism doesn't
18   apply in these types of collective actions, so only those
19   individuals who have joined the case are parties to the case
20   and will be subject to any ruling by the Court favorable or
21   unfavorable to them.  They're the only ones who would benefit
22   from any ruling in their favor, so those are the only
23   individuals who should be part of the analysis in this -- in
24   this case, obviously, so that's our position to answer the
25   Court's question on that.

Santillo - Argument                                          38

1             THE COURT:  Okay.  Now, that concludes my list of

2    questions, so anything else you want me to consider that we

3    haven't brought up so far you're free to tell me about.

4             MR. SANTILLO:  Certainly, Your Honor.  One thing,

5    counsel keeps bringing up that this kind of an exemption is

6    somehow different from any other exemption from the Fair Labor

7    Standards Act.  I would strenuously disagree with that on --

8    for two reasons.

9             One, in Packard, the Third Circuit specifically

10   recognized and treated this -- treated the exemption under the

11   Motor Carrier Act as it does any other -- any of the other

12   exemptions and said that they have to be narrowly construed

13   against the employer and that the individuals -- the drivers

14   would have to plainly and unmistakably fit within the narrow

15   confines of that exemption, so to sit there and say this

16   exemption --

17            THE COURT:  Yes, I think that -- I don't think that

18   -- those terms are disputed.

19            MR. SANTILLO:  I just don't think it -- it's not --

20   I don't think that this can be looked at somehow a one-off

21   type of an exemption.

22            And, again, what our position is is that the

23   question of whether these individuals fall within the Motor

24   Carrier Act exemption is one that can be decided by a jury and

25   should be.  The facts don't show that assuming every inference

1   in favor of the plaintiffs that as a matter of law all 34

2   individuals are not entitled to overtime or fit within the

3   narrow confines of the exemptions.

4        Counsel has brought up a whole lot of issues

5   regarding the Department of Transportation regulating Krapf in

6   inspections and whatnot.  That's all well and good.  That's

7   only one part of the analysis.

8        The second part of the analysis which the Department

9   of Labor regulations have made clear and also other District

10  Courts and other Appellate Courts have made -- I believe other

11  Appellate Courts have noted is that you have to look at what

12  the employee actually did.

13       And, again, there was some discussion about

14  depositions and what someone thought they might do and what

15  someone actually did, or may have done.  This -- we are in a

16  very unique position in that unlike any of the cases that we

17  have cited here, my plaintiffs or defendant, we know exactly

18  what they did.

19       Plaintiff -- the exhibit to defendant's motion,

20  Exhibit 4, is a spreadsheet that I created as part of an

21  analysis of the data that has been produced specifically to

22  the 34 individuals.  And in -- of that analysis these 34

23  individuals, during the period at issue, completed a total of

24  13,956 trips.  Of those trips, only 178 of them crossed state

25  lines, meaning 1.3 percent.

1    We don't have to guess at -- we don't have to have

2    clients try to recollect oh, did I do a run that went down to

3    the Navy Yard this day or did I do a run that went to New

4    Jersey that day?  We know.  This is a unique situation, so the

5    Court can see whether someone had a reasonable expectation

6    that they would go across state lines.

7         For example, there's one individual in particular,

8    his name is Harry Johnson.  He was employed during the

9    relevant period for 144 weeks and never crossed state lines.

10   Now, he came in day in and day out and never went across state

11   lines.

12        After a certain number of weeks whether he -- I

13   don't -- it doesn't matter how much he may have been told he

14   would cross state lines, he could -- it became pretty obvious

15   that he wasn't going to unless it was -- he did otherwise.

16        And the -- and the average number of weeks that

17   people was employed was approximately 79 of these 34

18   plaintiffs, so again this isn't a collection of individuals

19   who were there one or two weeks and it's a little subsect or

20   one-off group.  These people were there for significant

21   periods of time and significant travel and did not travel

22   out-of-state.

23        THE COURT:  Well, suppose they had 1,000 employees

24   and they were involved 50 percent in interstate commerce, but

25   there were 10 employees who were never in interstate commerce

1    trips and those 10 filed a collective action?

2              MR. SANTILLO:  Yes.

3              THE COURT:  Would those 10 then be entitled to

4    overtime as opposed to the other 9,990 employees?

5              MR. SANTILLO:  Yes, they would and I think that's

6    from --

7              THE COURT:  Does that make sense?

8              MR. SANTILLO:  I think it does made sense, Your

9    Honor, because, again, the basic rule is that all workers are

10   entitled to overtime.  It's only when those narrow exceptions

11   are carved out of that rule that people are not -- employers

12   are able to avoid the protection --

13             THE COURT:  So --

14             MR. SANTILLO:  -- of the overtime premium

15   compensation.

16             THE COURT:  So the employer has to keep a record for

17   each individual employee?

18             MR. SANTILLO:  I think they do and I think --

19             THE COURT:  And do they have to do it by week so

20   that they can determine what trips that person took that week?

21             MR. SANTILLO:  I think -- I think they could, Your

22   Honor.  I think if they -- if an employer's trying to take

23   advantage and not having to pay their employees overtime I

24   think there's certain steps they have to take.

25                  Again, they're looking for an exception from the

1    general rule, from the humanitarian purpose of the Fair Labor

2    Standards Act and the benefits that it provides not only those

3    employees, but the idea of having to hire more employees to do

4    these tasks so you don't have people working over 40.

5            And if they want to take that -- that want to take

6    that step and they made a business decision to do so, there

7    are certain steps they have to take and if they fail to do so,

8    as the Court recognized in the VanStory-Frazier case, that if

9    one of those parts of the exemption is not clearly met then

10   they don't get the benefit of not paying that person overtime

11   compensation.

12           THE COURT:  Now what about the 990?  There's a guy

13   there who does 50 percent of his trips in interstate commerce,

14   but then for three weeks he does not do any trip in interstate

15   commerce --

16           MR. SANTILLO:  I think --

17           THE COURT:  -- do they have to pay him overtime for

18   those three weeks?

19           MR. SANTILLO:  I don't think -- I don't think they

20   would if he's regularly traveling over interstate commerce --

21   over state lines and he thinks that he could be going over

22   interstate commerce -- going over state lines on a regular

23   basis those three weeks might be a one-off.  I think a Court

24   could find that he's not entitled to overtime because when you

25   look at his -- his behavior as a whole he was crossing state

1    lines on a 50 percent clip.  I mean, one thing to note here,

2    Your Honor --

3                THE COURT:  It seems like an administrative

4    nightmare.

5                MR. SANTILLO:  Well, that's one -- there's one

6    solution to that, Your Honor, is you can pay everybody

7    overtime and so -- and that's what the rule provides for.

8                And also, Your Honor, it's -- I think it's important

9    to note here is they have in the Transit Division, during the

10   relative period, they have had 34 separate runs, 30 of them do

11   not cross state lines, so people who are -- who join the

12   Transit Division and let's say you come in -- I didn't get

13   into this in discovery, so I may be just supposing here --

14   someone comes in and says you're going to be driving a transit

15   route and they were provided a list of the transit routes,

16   they'd see 30 out of 34 don't cross state lines, they might

17   have a pretty good expectation that they won't cross state

18   lines and then the statistics show that they don't.

19               Of the 14,000 trips these 34 individuals could only

20   cross states 1.3 times and that -- so we don't have to

21   suppose, we don't have to wonder whether they thought they

22   could or may have or what they recall, we know what they

23   actually did.

24               And this data also concludes those charter trips

25   that counsel mentioned in which they may be asked or may be

1    able to refuse to go across -- to turn down a trip.  This is

2    their entire activity.  We know exactly what they did and a

3    jury will be able to sit there and look at that and say

4    whether Mr. -- Mr. Johnson, who never crossed state lines,

5    never went out-of-state, whether he fulfills that narrow

6    exemption -- whether he still qualifies for that narrow

7    exemption of the overtime pay.  That's my basic argument.

8              THE COURT:  Okay.  Great.  Now, Mr. Schauer, do you

9    have anything additional you want to raise that we haven't

10   covered?

11             MR. SCHAUER:  Well, just a -- what I believe is to

12   put the rabbit in the hat, I believe the Department of

13   Transportation looked differently at the issue of 10 employees

14   who never go out-of-state in a 1,000 person employment force

15   -- employee force.  Here, even in the opt-in's, more than half

16   of them went out-of-state.

17             In the case cited by counsel, <u>Dauphin versus</u>

18   <u>Chestnut Ridge</u>, you know, it cited for the proposition -- for

19   the proposition that employers must generally present evidence

20   as to the character of the activities of each plaintiff.

21             The Court goes on to state, "Where, however,

22   interstate travel constitutes a natural, integral and

23   inseparable part of the employees duties such that any

24   employee is likely to be called on to perform interstate

25   travel, the employees are all subject to the motor carrier

1    exemption while they fill that position regardless of the

2    actual number of hours they individually devote to interstate

3    travel."  Pages four and five.

4           You can discuss the fact that the de minimis rule

5    doesn't even apply to drivers because they're clearly on the

6    road.  They're not mechanics, they're not loaders who are also

7    subject to this exemption.  They're on the road, so I would

8    just rely on those cases, Your Honor.

9           THE COURT:  Okay.  Thank you very much.

10           MR. SANTILLO:  Can I --

11           THE COURT:  It's a very interesting case.

12           MR. SANTILLO:  Can I make --

13           THE COURT:  The District Court's seem to be all over

14    the lot on it.  Yes, sir.

15           MR. SANTILLO:  Can I make one more comment to that?

16           THE COURT:  Sure.

17           MR. SANTILLO:  I just wanted -- just in response to

18    what counsel said, I think it's important to note 16 of these

19    34 individuals never crossed state lines for their entire

20    employment.  Of those 18 that did, eight of them crossed lines

21    -- state lines once.  That leaves a group of 10.  Of that 10,

22    five of them crossed it less than five occasions during their

23    employment, so this was very minimal.

24           Also, counsel mentioned it just there at the end,

25    and it came up in the reply brief, about the de minimis

1    exemption not applying.  And I think what he's referring to

2    was -- looking at whether a driver, their activities actually

3    are de minimis enough and I think what he's referring to is

4    the <u>Friedrich</u> case in the Third Circuit where those

5    individuals were computer technology guys who were driving to

6    go to -- to go to different facilities to fix people's

7    computers.

8            The question wasn't whether their interstate

9    activities were more than de minimis, they were going over --

10   crossing state lines all the time.  The question was whether

11   the fact that they were driving some part of the time -- only

12   a small part of the time and working on computers on the

13   other, whether that part qualified for the de minimis

14   exemption and here that's not the issue.  They're drivers, but

15   their interstate travel is way below the de minimis standard.

16   That's -- that's our position.

17           THE COURT:  All right.  Thank you very much.

18           MR. SCHAUER:  Thank you, Your Honor.

19           MR. SANTILLO:  Thank you, Your Honor.

20           THE COURT:  Court is adjourned.  Unless the Attorney

21   General's Office wants to take a position in this case.

22           UNIDENTIFIED COUNSEL:  We're not intervening.

23           THE COURT:  I agree with that.

24           (Proceedings concluded at 12:15 p.m.)

25                          * * *

1

2

3                    **C E R T I F I C A T I O N**

4

5

6            I, Joan Pace, court approved transcriber,

7    certify that the foregoing is a correct transcript from the

8    official electronic sound recording of the proceedings in the

9    above-entitled matter.

10

11

12    _____        December 2, 2013

13    JOAN PACE

14    DIANA DOMAN TRANSCRIBING

15

16

17

18

19

20

21